Filed 12/1/22  P. v. Pulidocolmenero CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079321 |
| v. | (Super.Ct.No. SWF1607111) |
| JORGE ALEJANDRO PULIDOCOLMENERO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.  Affirmed.

Jorge Alejandro Pulidocolmenero, in pro. per.; Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

Defendant and appellant Jorge Pulidocolmenero appeals from a trial court's order denying his petition for resentencing under Penal Code[1] section 1170.95 (now section 1172.6[2]). For the reasons forth *post*, we affirm the trial court's denial of defendant's petition.

## STATEMENT OF THE CASE

On August 5, 2017, an information charged defendant with murder under section 187, subdivision (a). The information also alleged that defendant personally and intentionally discharged a firearm and proximately caused great bodily injury and death to another person under sections 12022.53, subdivision (d) and 1192.7, subdivision (c)(8). The information did not name any other defendants. On September 18, 2018, a jury convicted defendant of premeditated murder. The jury also found true the gun enhancement.

On November 2, 2018, the trial court sentenced defendant to 25 years to life for the first degree murder, plus a consecutive 25 years to life for the gun enhancement.

On April 6, 2022, defendant filed a petition for resentencing. The trial court appointed counsel for defendant; however, no briefs were filed by either defendant or the prosecutor.

---

[1] All further statutory references are to the Penal Code unless otherwise specified

[2] While this appeal was pending, the Legislature amended and renumbered section 1170.95 as section 1172.6. (Stats. 2022, ch. 58, § 10.) We refer to section 1172.6 in this opinion, even though 1170.95 was the operative designation at the time of the underlying proceedings.

At the hearing on the petition for resentencing on June 3, 2022, the prosecutor stated: "We're asking the Court to dismiss the petition for no instructions in the record— well, there are instruction in the record, but they do not include anything on aiding or abetting, natural and probable consequences or felony murder. [¶] The opinion[3] states in 2021, defendant shot the victim point blank in the head in front of numerous people at the house and admitted that he shot, but did not know why he shot him. So basically a mental health issue, and defendant's not eligible."

In response, defense counsel stated that she spoke with defendant and he "object[ed] to the denial of his petition." The trial court then asked defense counsel if she took "issue with the People's representation that no felony murder rule, no—and no natural and probable consequences instructions were given." Defense counsel responded: "I do not take issue with that. I did review the appellate opinion from [defendant's] trial, and based on what I saw and what I saw in the system, I don't have—I'm not disputing what the People are representing in terms of the instructions or the arguments that were made at trial."

Thereafter, the court denied the petition, and stated: "The defendant is ineligible for relief, given he was not convicted under one of the—I'll call it the violative theories."

On July 6, 2022, defendant filed a notice of appeal.

---

[3] On April 30, 2021, we issued an unpublished opinion on defendant's appeal of his underlying conviction. (See *People v. Pulidocolmenero* (April 30, 2021, E071604) [nonpub. opn.].)

## FACTUAL AND PROCEDURAL HISTORY[4]

"In December 2016, Gordon 'Flash' Guinn had a house on Olson Street in Homeland. It was essentially a drug house at which numerous persons spent time, including Francisco; Nathaniel; Angela, who at the time was 17 years old; defendant; and Johnathan.[5] At the time, Guinn was depressed because his children were taken from him.

"Casaundra was Guinn's girlfriend. They had moved together to Homeland in 2014. She lived with him in the house on Olson Avenue. She and Guinn used drugs together; numerous friends, including Nathaniel, Angela and Francisco, came to the house to use drugs with them. Casaundra and Guinn had children together, which were taken away because of their drug use. Just prior to Guinn's murder, Casaundra had moved out and was living with another man in order to get sober and to try to get her children back.

"Nathaniel worked as an electrician but also sold drugs. He had been convicted in 2016 of selling methamphetamine. He hung out with Angela, Guinn, Francisco and defendant at Guinn's home in Homeland in 2016. They used a lot of drugs and Nathaniel would oftentimes provide the drugs. Nathaniel helped out Guinn financially on occasion.

---

[4] The factual history is taken from our opinion in defendant's prior appeal. (*People v. Pulidocolmenero*, *supra*, E071604).

[5] Witnesses are referred to by their first names to preserve their anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

4

"On December 20, 2016, Casaundra had gone over to Guinn's house. Defendant was also present. Casaundra and Guinn were preparing for a court appearance the following day to try to get back their children. Guinn asked defendant to leave so they could talk. Defendant got upset that he was being asked to leave. Guinn had to open the door and essentially 'kicked' defendant out of the house.

"On December 21, 2016, Francisco arrived at Guinn's house around 8:00 p.m. Angela, Guinn, Casaundra, defendant and Nick were present at the house. Several persons were drinking alcohol. Angela was at the house looking for Nathaniel, who had money for her from selling drugs for her. Nathaniel arrived around 10:00 p.m.[6] They were all drinking and using methamphetamine.

"Casaundra and Guinn were talking about getting back together. Casaundra and Guinn passed notes back and forth to each other about getting back together so that the others could not hear what they were talking about. Nick, Guinn and Angela were all near the couch in the living room and Francisco was sitting in a separate chair. Defendant was also at the house and was sitting on a paint can or bucket in front of the bathroom door. Everyone who was at the house that night was using methamphetamine.

"Francisco and Nathaniel went outside during the evening. Francisco denied that they were fighting. They went back inside and everyone was sitting in the same place in the living room. No one was arguing and Francisco did not see any weapons. Francisco sat down at a different chair and started drinking a soda.

---

**6** Angela believed that Nathaniel did not arrive at Guinn's house until around 4:00 a.m. before Guinn was shot.

"Defendant was sitting on the floor and then got up. Francisco heard a bang and thought it was a firework that they kept in the house. He looked up and defendant was holding a gun. Guinn was slumped over. Defendant pointed the gun at Francisco who pleaded for him not to shoot. Nathaniel immediately approached defendant and asked what he had done. Defendant responded that he had not done anything. Defendant pointed the gun at Francisco. Angela was drawing when she heard a loud bang and also thought it was a firework. She looked up and saw defendant with a gun and Guinn was on the ground. Francisco and Angela both identified the gun as a .38-caliber revolver. Nathaniel asked defendant, 'What the fuck are you doing?' This gave Francisco the chance to run out of the house. Angela left the house.

"Casaundra did not see defendant shoot the gun but saw the gun in his hand. Casaundra was screaming and Nathaniel yelled at defendant 'you just shot him.' Nathaniel pushed defendant out the front door.

"Casaundra got up and checked on Guinn. He was bleeding and groaning. Casaundra tried to find a phone to call an ambulance but could not find one. Francisco returned to Guinn's house. He saw Casaundra and told her to call an ambulance and to stay with Guinn. Francisco insisted that she told him she already called for an ambulance. Francisco drove back to his house, which was four or five blocks away.

"When Nathaniel and defendant were outside, defendant pointed the gun at Nathaniel and told him to go back inside. Nathaniel did not comply. Nathaniel told defendant that he had just ruined his life by shooting Guinn. Defendant pointed the gun at Nathaniel demanding his truck keys. Nathaniel refused and told him he had to shoot

6

him to get his truck. Nathaniel had an instinct that defendant would not shoot him. Nathaniel offered to drive defendant away from the scene. Defendant eventually just walked away to his house down the street.

"Nathaniel went back inside and told Casaundra to lock herself in the bedroom in case defendant returned to the house. Casaundra complied and hid in the bedroom. Casaundra at this point called for an ambulance on Nick's cellular phone. Guinn was still alive. Casaundra told the dispatcher that her boyfriend had been shot but did not give the address to the dispatcher. She immediately hung up. Nathaniel went outside to make sure defendant was not coming back. He then drove Casaundra to a friend's house because she was afraid of the police. Nathaniel did not stay with Guinn because he was a convicted felon and would get in trouble. He spent the night at Francisco's house.

"Francisco and Angela did not call the police or for an ambulance. Casaundra left before the police came to help Guinn because she thought everyone was going to try to pin the murder on her. She was also afraid that defendant would come back. She was dropped off a few doors down from Guinn's house and did not immediately hear sirens. Nathaniel never followed up to see if the ambulance arrived at Guinn's house.

"Johnathan had received a call from Nathaniel around 1:00 a.m. that he should come to Guinn's house to party with them. He was with his girlfriend so he did not go over to the house until approximately 3:00 a.m. When he arrived, he did not see anyone and there were no cars parked in front. He went inside and found Guinn on the floor. Guinn was still breathing but blood was coming from his mouth and ear. Guinn did not

7

have a cellular telephone so he ran across the street and borrowed a neighbor's phone and called 911.

"Riverside County Sheriff's Department Deputy . . . Zanten was dispatched to Guinn's house at 3:12 a.m. on December 22, 2016. When he arrived, Guinn was lying on the floor with significant blood around him and Johnathan was applying pressure to Guinn's head. Guinn was alive. Deputy Van Zanten called for an ambulance. Other officers and an ambulance arrived. Deputy Van Zanten was at the house until 11:00 a.m. the following morning and no other persons came by the residence. Guinn was taken to the hospital but died as a result of a gunshot wound to his head.

"Defendant's house was searched. He lived only three houses from Guinn's house. A .38-caliber casing for a revolver was found in the home.

"Riverside County Sheriff's Investigator . . . Paixao interviewed defendant around 10:00 p.m. on December 22, 2016. Prior to the interview, defendant was acting bizarrely. He 'mess[ed]' with his handcuffs and was able to remove one. Defendant was given a bottle of water and he used it to wash off his hands. Investigator Paixao surmised it was an attempt to get rid of gunshot residue. Because it was raining and had been some time since the shooting, Investigator Paixao decided not to test defendant for gunshot residue.

"Defendant was at Guinn's house the prior night around 6:00 or 7:00 p.m. There were five or six other people present but he denied knowing their names. He and Guinn smoked cigarettes and had some drinks. He then went home around 10:00 p.m. Defendant had heard that Guinn committed suicide. Investigator Paixao told defendant that Guinn had been murdered. Investigator Paixao told him that he had spoken with

8

other people present and defendant's statement was not true.  Defendant then told Investigator Paixao most of the first names of the persons present.

"Defendant stated that a few nights prior to the shooting, he and Guinn had gotten into an argument because Guinn had asked him to leave his house because Guinn had a court appearance.  They discussed the issue the night of the shooting and they were fine with each other.

"Defendant denied that he shot Guinn and insisted he did not have a weapon that night.  Investigator Paixao told him that the only rumors on the 'street' were that defendant had shot Guinn.  Defendant stated the rumors were not true.  He did not shoot Guinn.  Investigator Paixao told him they had evidence that he was the shooter and defendant asked him what evidence.  Investigator Paixao told him he knew he was the shooter but wanted to know why he had shot Guinn.  Defendant denied he was involved and asked why the Investigator was being so aggressive with him.  He asked if he was being charged.  Investigator Paixao surmised that defendant was upset that Guinn had disrespected him the night before.  Defendant insisted that he was more mature than to shoot someone over such a disagreement.  Defendant insisted he left before Guinn was shot.

"Defendant brought up his mental health; Investigator Paixao indicated he knew nothing about any of his mental health issues.  Investigator Paixao and the other interrogating officer told defendant they were sure he shot Guinn because he was identified by all the witnesses and they just wanted his side of the story.  Defendant responded, 'Then I guess it's me man.'  Investigator Paixao asked, 'You guess it's you?'

9

Defendant responded, 'Yeah, it's me, I guess.' Defendant told them he heard voices that told him all types of things but denied the voices told him to kill Guinn.

"Defendant then said he never had a gun that night. Investigator Paixao encouraged defendant to tell him where the gun was located and what had happened. Defendant stated, 'What are you trying to ask me? You're sitting here pretty much putting it in my mouth that I shot somebody. What else do you want man?

"Defendant stated that he was sitting in the living room and suddenly everyone got upset with him and told him to leave. Guinn was shot but defendant did not admit to being the shooter. He then admitted he pointed a gun at Guinn. Defendant mentioned voices in his head but that he did not know what had happened. Defendant admitted he shot Guinn but did not know why he shot him. He denied it was because he was angry, disrespected or about him 'being not okay in the head.' No one convinced him to kill Guinn. Defendant mentioned Guinn being involved in a car crash that almost killed defendant's son. Defendant told the investigators the gun was not at his house but refused to tell them where it was. Investigator Paixao asked, 'You can't tell me? Or you won't tell me? I'm asking that, I don't know.' Defendant responded, 'I'm not helping my case if I do. I don't understand man.'

"Investigator Paixao admitted at trial that persons in the criminal world did not like being seen talking to the police. Defendant never named Nathaniel. Nathaniel's house was never searched.

"Investigator Paixao also spoke with Casaundra, who advised him that Nathaniel, Francisco, Nick, defendant, and Angela were present at Guinn's house. She stated that

10

Nathaniel had told defendant that he owed Nathan $100. Defendant denied that he owed the money but eventually paid it. Paixao also spoke with Angela, who told him the shooting occurred around 2:00 a.m.

"Johnathan told a sheriff's detective that Nathaniel was a new drug dealer in Homeland and that he had a lot of 'haters' in the area because he was throwing around money and drugs to start his business. Johnathan did not know defendant. Casaundra testified Nathaniel asked her and the others not to divulge that Nathaniel was there that night because he was on parole. Nathaniel was convicted of selling drugs after Guinn's shooting. Angela heard rumors that Guinn was shot because of gangs, cartels and drugs. Several days after the incident Angela wanted to go to the police but Nathaniel was worried about talking to the police because they had heard there was a Mexican drug cartel involved. They did not go to the police."

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and has requested this court to undertake a review of the entire record. Pursuant to *Anders*, counsel identified the following issue to assist the court in its search of the record for error:

1.     "Did the trial court err in concluding that [defendant] failed to establish a prima facie case?"

11

We offered defendant an opportunity to file a personal supplemental brief. On November 3, 2022, defendant filed a two-page handwritten brief.

In his brief, defendant first argues that his petition should have been granted because the trial court did *not* give the felony murder or natural and probable consequences jury instructions. Defendant stated: "I have been informed my request for relief was denied because I [was] not given an instruction on felony murder and/or the natural and probable consequences doctrine. I believe this is precisely the reason why I should be considered for relief. From my understanding of laws relevant to the type of cases as mine, its [*sic*] required these instructions be given as part of the jury instructions as well as instructions on any possible related lesser offenses."

Defendant's argument does not support his appeal. Instead, defendant's argument supports the trial court's denial of his petition. As provided *ante*, defendant was the sole person found responsible for the murder—and the trial court noted that. Defendant was not convicted under the felony murder rule or under the natural and probable consequences doctrine—as required under section 1172.6; these instructions were not given to the jury. The trial court correctly found that defendant is ineligible for relief under section 1172.6.

Defendant also argues that ineffective assistance of counsel (IAC) was rendered during the proceedings related to his underlying case. In his supplemental brief, defendant stated: "There is also the [] fact brought up by my appeal lawyer, with regards to the ineffective assistance of counsel I was provided through the proceedings leading to and during trial in which my public defender failed to competently represent me, by not

12

exploring all the available possible defenses to be presented, as well as failing to properly explain to me the process, my options, and the various instances in which he was supposed to advocate on my behalf."

We first note that this is an appeal from the denial of defendant's petition for resentencing. This is not an appeal from defendant's underlying conviction. Moreover, we already addressed defendant's IAC argument in our unpublished opinion, and found that defendant could not "show his counsel erroneously relied on [one of the witnesses] and has failed to show he received ineffective assistance of counsel." (*People v. Pulidocolmenero*, *supra*, E071604, at p. 23.)

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error. We are satisfied that defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*Id.* at p. 126; *People v. Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

## DISPOSITION

The trial court's order denying defendant's petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.